**Opinion issued March 21, 2024**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-23-00380-CR

————————————

**VICTOR HUGO JASSO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 228th District Court
Harris County, Texas
Trial Court Case No. 1748699

## MEMORANDUM OPINION

A jury convicted Appellant Victor Hugh Jasso of the Class A misdemeanor offense of criminal trespass of a habitation. The trial court assessed a sentence of one year of incarceration in the Harris County Jail. The trial court suspended the sentence and placed Jasso on community supervision for two years. In a single

issue, Jasso argues the trial court erred by admitting text messages sent by Jasso to the complainant's mother, arguing the messages were more prejudicial than probative and they were evidence of "clearly extraneous offenses" not related to the present case.

Because the trial court did not abuse its discretion in admitting the text messages, and in any event, admission of the text messages was harmless, we affirm the trial court's judgment.

## Background

On November 24, 2021, Liza Gonzalez and Jasso took their two children shopping for Thanksgiving outfits. After shopping, they went out to dinner and then returned to Gonzalez's house. By the time they got to Gonzalez's house, she and Jasso had been arguing and he allegedly was drunk. Jasso "barged" in the house, took the packages from the shopping trip, and left.

Jasso returned several hours later, after Gonzalez and the children were sleeping, and allegedly broke into the house. Gonzalez, who was awakened by a "loud bang," did not know at first who was in the house, and she grabbed her gun. When she realized it was Jasso, she called 9-1-1.

Gonzalez told the 9-1-1 operator, "The father of my kids is here. He broke into my house while I was sleeping." Gonzalez said, "I'm threatening to shoot him if he does not leave." She told the operator Jasso "always carries a gun on him"

2

but she did not see one at that moment. Gonzalez told the operator she had "no idea" how Jasso broke in, but that "he's threatening my life and my home." Gonzalez can be heard calling Jasso a "liar" in response to his stating Gonzalez let him in the house,[1] and she can be heard screaming at Jasso to get out of her house.

Jasso was arrested and indicted for burglary of a habitation.[2] The indictment alleged that "on or about November 24, 2021," Jasso "did then and there unlawfully, with intent to commit an assault, enter[ed] a habitation owned by Liza Gonzalez, a person having a greater right to possession of the habitation than [Jasso] . . . without effective consent of the Complainant, namely without any consent of any kind." Jasso pleaded not guilty, and the case proceeded to a jury trial.

---

[1] Although Jasso's voice is audible in the call, it is not possible to understand most of what he is saying.

[2] One commits burglary if, without the effective consent of the owner, the person
- (1) enters a habitation, or a building (or any portion of a building) not then open to the public, with intent to commit a felony, theft, or an assault; or
- (2) remains concealed, with intent to commit a felony, theft, or an assault, in a building or habitation; or
- (3) enters a building or habitation and commits or attempts to commit a felony, theft, or an assault.

TEX. PENAL CODE § 30.02(a).

## The Trial

### A.      The Text Messages

The State sought to admit thirteen pages of screenshots of a text message exchange between Jasso and Gonzalez's mother, Lisa Castillo, which concerned Jasso's alleged prior burglary of Gonzalez's house in January 2021, ten months prior to the charged burglary.  The exchange occurred after Castillo learned Jasso was in Gonzalez's home without permission, allegedly taking some of Gonzalez's possessions.  Gonzalez was in Mexico at the time.  Among the texts were the following exchanges:

> Jasso:     Stay in ur own lane before u die . . .
>
> Worry about ur own life before u die fucking with me.

> Castillo:     Terrorist threat on my life.

> Jasso:     Freedom of speech i can say wtf i want

> Castillo:     Like I said you have one hour to take her gun and her $400 10 issues[3] back to her apartment.  I have the text message on baby Victor's phone saying you were in her apartment.  You're gonna go to [jail] for stealing her stuff.  And your gonna go to [jail] for threatening my life and I don't play

> . . .

> Jasso:     She owes me 800 get my money back idgaf fuck u and her. She asked for it barrowed so I got this ass collateral [] the cops aint going do shit wat makes u fucking think I am scared lol I swear I just laugh

---

[3]      Presumably, "10 issues" refers to "tennis shoes."

Im takin my fridge washer n dryer n tvs bitcj since u wana buut in shit that dosent have shit to do with u BITCH. Call the cops im here now taking all my shit bitch

Castillo: You went into her apartment without permission and stold her stuff. That is burglary of a habitation.

Jasso: [] I got a key dumb bitch

Castillo: And you threatened my life!!

Jasso: Ok lawyer [] should went to school for that

I sure did!!!

Castillo: No you don't! You broke in!!

OK I'm not waiting and not giving you an hour to take stuff back and calling the law right now in filing the police report on you and giving them all your information

. . .

Jasso: Pay me ot pay ben taub bitch

Im here at her house getting my fridge and washer call them shit im here now

U dont scare me lisa not one fucking bit pay me wat ur daufhter owes me

. . .

I will Cause her hell until dead idgaf!!!!!

Tell them I am armed and dangerous white chevy Silverado plated [] its not a game anymore im tired of ur and lizas shit . . . u should have never disrespected me!!!

5

After opening arguments and before the first witness testified, Jasso objected to the State's proffer of the text messages:

Mr. Hughes:[4]    So, Judge, these text messages are completely irrelevant to this case. We would argue that they're highly prejudicial. They're not probative. So we would object to [Castillo's] testimony in its entirety pursuant to rules 403 and 404(b). In particular, we would object to the text messages; and in addition to the 403, 404(b) objections, we'd also object on the basis of relevance.

The Court:    What is the relevance?

Ms. Anderson:[5]    Judge, the relevance goes back to the defendant's state of mind at the time of the offense that he's on trial for. So these text messages . . . The witness is telling the defendant that he cannot be in that room. He's telling her that he's in the room taking items from the complainant. It's extremely relevant. So it goes to show his state of mind for this offense.

The Court:    That he has no permission to be in the home?

Ms. Anderson:    Yes, without effective consent of the complainant, which he did not have on this day in January.

Mr. Hughes:    But the text messages, I believe, are between him and Ms. Castillo. Ms. Castillo is not named in the indictment in this case as the person with a greater right to possession. So we would argue that the text messages are further irrelevant because they're

---

4    Mr. Hughes was Jasso's trial counsel.

5    Ms. Anderson was trial counsel for the State.

6

|  |  |
|---|---|
|  | not between Mr. Jasso, the complainant in this case, and Ms. Gonzalez. |
| The Court: | What's her connection to the home? |
| Ms. Anderson: | She's the complainant's mother. The offense occurred back in January. The complainant was in a different country at the time and that's when the altercation with the defendant comes to the home. So that's why the complainant's mother text[ed] the defendant to tell him to leave. |
| The Court: | Okay. I'm going to allow it but again, keep it brief. |
| Ms. Anderson: | Yes, Judge. I'm not going to go into a circumstance that she's not aware of. I'm just going to talk – |
| The Court: | Just to show he went there without permission? |
| Ms. Anderson: | Yes, that's it. |

The court overruled the objection to the admission of the text messages. The defense re-urged its objection[6] to the texts pursuant to Rules 403 and 404(b) during Castillo's testimony:

|  |  |
|---|---|
| Mr. Hughes: | . . . So, Your Honor, our first objection would be relevance. Second objection would be hearsay. There has not been a proper foundation established to show that these messages were sent by Mr. Jasso. And, again, we renew our objection under rules 404(b) as well as 403 and that the prejudicial effect outweighs any probative values. |
| The Court: | All right. Now, what was the purpose of these exhibits? |

---

[6] The defense also moved for a mistrial, which the trial court denied. Jasso does not appeal the denial of his motion for mistrial.

. . .

Ms. Anderson:   Judge, [] these text messages include essentially threatening by the defendant and that goes [to] intent to commit assault.

. . .

Mr. Hughes:   And, Your Honor, again, it's our position I don't think it's been established that they're from the defendant. They're highly prejudicial. They are evidence of extraneous offenses. Therefore, they should not be admitted under rule 404(b). And as far as they're being admitted to show that he didn't have permission, again, if Ms. Gonzalez is not a party to the conversation, I don't see how they're relevant.

. . .

The Court:   Okay. State again the purpose for what you're introducing these.

Ms. Anderson:   Judge, I'm introducing the text messages between this witness and the defendant to show, one, his state of mind for—at the time of this offense. Additionally, his state of mind for the offense that's on trial today. This happened within the same year and it's extremely relevant to show that he disregarded going—he disregarded the witness as well as when the complainant tells him to not go in the home, disregards what they say, and then additionally does it again in this offense in November.

And if we're looking at—additionally if we're looking to 404(b), this goes to show the defendant's motive and intent as well as mistake of fact to show that the defendant is going into the

8

|  |  |
|---|---|
|  | home with the intent to commit assault. And I have to—that's my burden to prove that he had the intent to commit assault and this goes to show part of that. |
| The Court: | Okay. But on this occasion, the complainant wasn't there, right? |
| Ms. Anderson: | Correct. |
| The Court: | And what is your objection? |
| Mr. Hughes: | First and foremost, Your Honor, this is classic 404(b) and 403 evidence. We'd object that this is evidence of extraneous offenses that are not related to the offense on trial. We argue that these—And for the record we're objecting to all 13 pages of Exhibit 1. |
|  | Also under rule 403, these text messages are highly prejudicial and our—we also object that they're irrelevant in that they're allegedly between Mr. Jasso and Ms. Castillo and not between Mr. Jasso and Ms. Gonzalez, who's the complainant. We'd also argue that they're hearsay and that a proper predicate or foundation has not yet been established to even show that this phone number belongs to Mr. Jasso. |
| The Court: | Okay. Now, you're claiming that this is admissible under 404(b)(2) for some other purpose such as opportunity, intent, preparation, plan, knowledge, and so forth? |
| Ms. Anderson: | Yes, Your Honor. And the text messages relate to the complainant. He puts her name in these text messages. And, so, I think those are extremely relevant. While there's always some, you know, sentiment for evidence being prejudicial, that |

doesn't outweigh the probative nature. It's not unfairly prejudicial at this point.

The Court: What is a similar offense, allegedly something that arguably is a burglary?

Mr. Hughes: Well, I guess, Your Honor, one thing I would also like to point out, I think that this first—the incident they're referring to in January when Mr. Jasso was charged,[7] I believe that the allegation was he entered with the intent to commit theft and not to commit assault. And, so, I would argue that that renders this evidence further irrelevant. I don't agree they're close in time. There's ten months difference between January and November, 2021. So they're remote. And, again, I think the offense perhaps would be terroristic threat contained within these messages, assault by threat. Those are clearly extraneous offenses that don't relate to the case that's on trial.

. . .

The Court: I'm making my ruling that these are admissible under 404(b)(2) for another purpose such a motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. And I'm also finding that the probative value is not outweighed by the prejudicial effect.

## B.    The Witnesses

Three witnesses testified for the State during the guilt innocence phase of the trial. The defense did not call any witnesses during the guilt innocence phase.

---

[7]    Jasso was not charged in connection with any threats made in the January 2021 texts.

### 1. Lisa Castillo

Castillo is Gonzalez's mother. According to Castillo, on January 24, 2021, her daughter, who was in Mexico, called to tell her Jasso "went into her house and he stole her gun and her tennis shoes." After talking to Gonzalez, Castillo texted Jasso and told him he had one hour to take Gonzalez's gun and shoes back to her house. The jury was shown thirteen pages of screenshots from Castillo's phone of her text exchange with Jasso. Castillo testified Jasso was not charged with making a threat in connection with the text messages.

### 2. Liza Gonzalez

Gonzalez testified that she and Jasso, the father of her children, ended their relationship about two years prior to the incident at issue but were "trying to coparent." Gonzalez testified that on November 24, 2021, she and Jasso took their two children, who were ten and twelve years old at the time, shopping for Thanksgiving outfits. After shopping, they had dinner. When they returned to Gonzalez's home, she and Jasso "basically were already arguing." The argument began in the car and ended outside her home. She said Jasso was drunk and "acting aggressive." The argument ended by his "cussing at my kids and telling them you want to tell your mom things, well, fuck y'all." He "barged" in the house, took the clothes they had just purchased for the children, and left. According to Gonzalez, when he left, he "was aggressive. He was mad. He was

11

just making threats as far as, like, fuck y'all. I don't want those kids . . . just things like that."

After leaving, Jasso "continued to make threats" by phone and possibly by texts.

Gonzalez testified that she and the children went inside the house, locked the door, and she fell asleep with her daughter while watching a movie. She was "awakened by a loud bang" sometime between 1 and 2 in the morning. Her daughter began to scream and Gonzalez grabbed her gun. "I felt in fear. I had no idea. Somebody just broke into my home." She testified that she "jumped up, grabbed my gun, and . . . at this point, my adrenaline is high. I pulled it on—you know, I put it on whoever was breaking into my home." When she realized Jasso was the person in her house, she called 9-1-1.

A recording of the 9-1-1 call was admitted into evidence.[8] Gonzalez testified that during the 9-1-1 call, Jasso was "very aggressive." He was "yelling. Throwing things." He yelled that "he lived there. He [was] just calling me names, that I was gonna regret calling the cops."

Gonzalez testified that Jasso "never" lived at her home. He occasionally spent the night there, staying on the sofa or in a child's bedroom. According to

---

[8] Jasso objected to the admission of the 9-1-1 recording as hearsay, improperly authenticated, irrelevant, and violative of Rules of Evidence 403 and 404(b). The trial court overruled the objection. Jasso does not appeal the admission of the 9-1-1 recording.

Gonzalez, Jasso "never had any kind of permission to stay the night or to come back." Even though he spent the previous night at her home, she testified, Jasso did not have permission to stay at her home on November 24, 2021.

When she grabbed her gun, she did not know who had entered her house. Once she realized it was Jasso, she called 9-1-1. She pointed her gun at him and told him she would shoot him "[b]ecause [she] felt very threatened by him." She testified that she was "so angry and fed up with him." According to Gonzalez, he threw a bottle of water at her and then he went downstairs, threw things from her kitchen island, and kicked her dog.

She testified that Jasso always carried a gun and threatened her life the night of his arrest. When the police arrived, "he continued to be—again, he's very persistent and aggressive and he just continued to say things like they're not gonna do shit, claimed he lived there and to throw things around in my home." The jury was shown a picture of the front door frame, which showed damage that, according to Gonzalez, had not been there before that night. When she came downstairs, the door was wide open, and it had been kicked in.[9]

According to Gonzalez, the January 2021 text messages between her mother and Jasso "were about him breaking into my home" and "threatening her . . . just

---

[9] Gonzalez testified that she was able to lock only one of her two locks that night because the other lock was broken "because of another time where [Jasso] tired to come into my home without permission."

13

threats, many threats that he's made." She confirmed the text message that said, "I will [c]ause her hell until dead idgaf!!!!!" refers to her. Prior to the text exchange, Jasso called Gonzalez and told her he was in her house and took her shoes and gun. "That's how [she] knew that he broke" into her house. She and her mother called the police, who found an open window.

During the twelve years of their relationship, Jasso made "death threats" toward her but never struck her. Once he put a gun to her head, but she did not file a police report about that. Gonzalez testified that "many times," Jasso "tried to break into [her] home without permission."

### 3.    Officer Jesus Paz

Officer Paz is an advanced peace officer with the Pasadena Police Department. He testified that on November 24, 2021, he was working the night shift. He was dispatched to a residence in Pasadena, Texas for a call of "disturbance with a weapon." He was advised there "was a female that had a male at gunpoint who had broken into a residence."[10] According to Officer Paz, by the time he arrived at the scene, his partner had placed Jasso in handcuffs and put him in the back of a patrol car.

Officer Paz testified he spoke to Gonzalez, who was "a little frantic. She was kind of all over the place trying to tell me everything that happened; and I had

---

[10]    Officer Paz testified that the notes he received when the call was dispatched indicated the woman was holding the gun on her "baby's daddy."

to tell her to slow down, which she eventually did[.]" She pointed at the frame of her front door and told Officer Paz that Jasso "had broken into the residence." Jasso saw the door frame was split near the dead bolt plate, "which is normally an indicator of a forced entry that we see usually in burglaries of habitation." Officer Paz testified that the door to the home, which was a duplex, was "a heavier door than what [he] would normally see in an apartment complex." He said the door frame was "split but it wasn't shattered." He said he determined the door was opened with force. However, he said it is possible the frame could have been damaged at some earlier time.

Officer Paz and Gonzalez went upstairs[11] and "she kind of showed me where they had gotten into the argument, that . . . she woke up by him screaming at the doorway of their daughter's bedroom and then we walked over to her bedroom where he threw a bottled water at her."[12] Officer Paz said Gonzalez was not holding a gun when he arrived.

Officer Paz then spoke with Jasso, who was in the back of the patrol car but had not been arrested. Jasso told him he and Gonzalez had been shopping earlier in the evening with their children and right before they got back to the house, he

---

[11]     A muted, minute-long video of Officer Paz's bodycam was played for the jury. The video showed the officer following Gonzalez upstairs and into her bedroom.

[12]     The water bottle was photographed but there were no fingerprints or DNA to establish Jasso had touched the bottle.

and Gonzalez began to argue. Jasso told Officer Paz he had been staying in the house for about three days, but Gonzalez said he did not live there. Gonzalez and her son[13] told Officer Paz that Jasso had spent only the previous night in her house with her consent.

Before he was asked about it, Jasso told Officer Paz that he did not break the door. Officer Paz testified he thought it odd that Jasso would mention the door before being asked about it. Jasso told Officer Paz, "the door was open, unlocked; and he just went right in." According to Officer Paz, Gonzalez said Jasso did not have permission to be there.

Officer Paz contacted the district attorney's office, which advised they would accept charges of burglary of a habitation. At that point, Jasso was told he was under arrest and Officer Paz took him to jail.

The jury convicted Jasso of the lesser-included offense of criminal trespass of a habitation. The trial court imposed a sentence of one year in the county jail. The court suspended the sentence and imposed a two-year probated sentence. This appeal ensued.

---

[13]  Officer Paz interviewed Gonzalez's son the night of the incident but there was little information given about that interview and the son did not testify at trial.

## A. Standard of Review

We review a trial court's decision to admit or exclude evidence for abuse of discretion. *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002); *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). A trial judge abuses his discretion when his decision falls "outside the zone of reasonable disagreement." *Id.* at 83; *see also Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008) (stating trial court abuses discretion only if its decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree").

Even if the trial court erred in admitting or excluding evidence, we will not reverse unless the appellant establishes harm. When constitutional error is implicated, "the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a). For non-constitutional error, any "error, defect, irregularity, or variance that does not

---

[14] Although Jasso states in his brief that he objected to the texts in the trial court "under both Rule 404(b) and Rule 403," his appellate brief is confined to Rule 403. We thus hold he waived his Rule 404 argument. *See Chaves v. State*, 630 S.W.3d 541, 555 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (holding appellant waived sufficiency complaint by failing to provide supporting argument, substantive analysis, or citation to appropriate authorities or portions of record); *Shoemaker v. State for Prot. of C.L.*, 493 S.W.3d 710, 718 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (holding Rule 404 argument waived because of failure to adequately brief issue).

affect substantial rights must be disregarded." TEX. R. APP. P. 44.2(b). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. U.S.*, 328 U.S. 750, 776 (1946)).

## B.     Rule 403

Texas Rule of Evidence 403 allows the court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. In a Rule 403 analysis, the presumption is that the probative value of relevant evidence outweighs its prejudicial effect. *Calvert v. State*, No. AP-77,063, 2019 WL 5057268, at *22 (Tex. Crim. App. Oct. 9, 2019) (not designated for publication); *see also Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997) ("In keeping with the presumption of admissibility of relevant evidence, there is a presumption that relevant evidence is more probative than prejudicial.") (citing *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1990)). Rule 403 contemplates the exclusion of evidence only when there is a "clear disparity" between the degree of prejudice and the probative value of the evidence. *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009) (quoting *Conner v. State*, 67 S.W.3d 192, 202 (Tex. Crim. App. 2001)). In a Rule 403 analysis, "a reviewing

court is to reverse the trial court's judgment 'rarely and only after a clear abuse of discretion.'" *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999) (quoting *Montgomery*, 810 S.W.2d at 389). Rule 403 concerns only "unfair" prejudice. *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018). "Evidence is unfairly prejudicial if it has the capacity to lure the fact-finder into declaring guilt on a ground different from proof specific to the offense charged." *Id.*

In conducting a Rule 403 balancing test, the trial court must consider the following non-exclusive factors:

> (1) how probative the evidence is, (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence.

*Colone v. State*, 573 S.W.3d 249, 266 (Tex. Crim. App. 2019). The factors "may well blend together in practice." *Gigliobianco v. State*, 210 S.W.3d 637, 642 (Tex. Crim. App. 2006).

Jasso was charged with burglary of a habitation with intent to commit assault. *See* TEX. PENAL CODE § 30.02(a)(2). The indictment alleged that "on or about November 24, 2021," Jasso "did then and there unlawfully, with intent to commit an assault, enter[ed] a habitation owned by Liza Gonzalez, a person having a greater right to possession of the habitation than [Jasso] . . . without effective consent of the Complainant, namely without any consent of any kind." As part of

19

his defensive theory, defense counsel argued Jasso had not broken into the house, but had entered the house only to retrieve some of his things. He told the jury that in November 2021, Jasso and Gonzalez had been "in a relationship for about 12 or 13 years on and off," they shared two young children, both of whom were in the house that night, and Jasso had spent the prior night, as well as other nights, in the house with Gonzalez's consent.

### 1.    First Factor: Probative Value of the Evidence

The Court of Criminal Appeals has defined "inherent probativeness" as "[h]ow compellingly evidence of the extraneous misconduct serves to make more or less probable a fact of consequence." *Montgomery*, 810 S.W.2d at 389–90. "This is often, although by no means invariably, a function of the similarity of the extraneous transaction to the charged offense." *Id.* at 390. "It is also a function of the strength of the proponent's evidence to show the opponent in fact committed the extraneous conduct." *Id.*

Jasso argues the challenged texts are not probative of his intent because he could not have entered Gonzalez's house in January 2021 to assault her, given that he knew she was not there. He states, "From the text messages, it looks like the complainant owed him money and he was taking what was his." Jasso further argues that his alleged "intent" is questionable because Gonzalez testified he had never struck her before. Finally, he argues, given that the text messages were not

probative of the offense for which he was charged, they should have been excluded.

The State argues we should examine the probative nature of the text messages for Jasso's extraneous conduct using a three-part analysis taking into account: (1) "the similarity between the prior act and the offense charged," (2) "the closeness in time of the extraneous transaction to the charged offense," and (3) "the availability of alternative sources of proof." *Walker v. State*, No. 14-01-01197-CR, 2003 WL 21466960, at *4 (Tex. App.—Houston [14th Dist.] June 26, 2003, pet. ref'd) (mem. op., not designated for publication) (citing *Robinson v. State*, 701 S.W.2d 895, 898 (Tex. Crim. App. 1985)).[15]

As it concerns the similarity between the prior act and the charged offense, the State argues that both the January burglary and the charged November burglary occurred at Gonzalez's home, and both occurred when Jasso allegedly entered her home without her consent. In both cases, Gonzalez was the "burglary victim." Thus, the State argues, the texts were probative of Jasso's "intent, motive, lack of mistake, and lack of effective consent."

---

[15]  *See also Hill v. State*, No. 11-13-00069-CR, 2015 WL 252316, at *7 (Tex. App.—Eastland Jan. 15, 2015, pet. ref'd) (mem. op., not designated for publication) ("As important measures of probative force, we consider the closeness in time, the presence of similarities between the charged and the extraneous offense, and the strength of the evidence to prove the extraneous offense." (citing *Montgomery v. State*, 810 S.W.2d 372, 390 (Tex. Crim. App. 1991) and *Robinson v. State*, 701 S.W.2d 895, 898 (Tex. Crim. App. 1985)).

Second, concerning the closeness in time of the extraneous transaction to the charged offense, the State argues the ten-month span between the January 2021 texts and the November 2021 alleged burglary is not too remote to be considered, noting there is no bright-line rule as to when an extraneous transaction can be considered.[16] "[T]here is no per se rule as to when an extraneous offense is too remote in time to be introduced in evidence." *Perez v. State*, No. 12-14-00116-CR, 2015 WL 3451556, at *6 (Tex. App.—Tyler May 29, 2015, pet. ref'd) (mem. op., not designated for publication) (citing *Templin v. State*, 711 S.W.2d 30, 34 (Tex. Crim. App. 1986)).

Third, the State argues the texts are probative of Gonzalez's intent. The State points out that as part of his defensive theory, Jasso's counsel argued Jasso had effective consent to be in the house and that he was there "not to commit assault, but to take his clothing—or move his items." In other words, Jasso lacked a motive and had a good relationship with Gonzalez. The State argues that because Gonzalez interrupted Jasso's November 2021 intrusion, the act "did not allow the

---

[16] We have held that remoteness of extraneous-offense evidence is to be considered under a Rule 403 analysis. *Martinez v. State*, No. 01-19-00906-CR, 2021 WL 1679546, at *7 (Tex. App.—Houston [1st Dist.] Apr. 29, 2021, no pet.) (mem. op., not designated for publication); *see also Newton v. State*, 301 S.W.3d 315, 318 (Tex. App.—Waco 2009, pet. ref'd) ("[R]emoteness is of import not when determining whether when extraneous-offense evidence has probative value but when assessing whether the probative value of such evidence is substantially outweighed by the danger of unfair prejudice or similar concerns under Rule 403.").

jury to determine the appellant's ultimate intent." The State argues that because "specific intent and effective consent were disputed material facts in the case," the texts were probative in that they were necessary to establish intent, lack of effective consent, motive, and lack of mistake. "Where intent cannot be readily inferred from the act itself, other evidence relevant to that intent, even evidence of extraneous offenses or transactions, will invariably be more probative than prejudicial." *Corley v. State*, 987 S.W.2d 615, 620 (Tex. App.—Austin 1999, no pet.) (citing *Morgan v. State*, 692 S.W.2d 877, 880 (Tex. Crim. App. 1985)).

We are not troubled by the remoteness of the texts. *See Parlin v. State*, 591 S.W.3d 214, 224 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (holding one-year time lapse "does not per se erase the probative value of the testimony."); *Gomez v. State*, No. 13-17-00180-CR, 2019 WL 470933, at *5 (Tex. App.—Corpus Christi Feb. 7, 2019, pet. ref'd) (mem. op., not designated for publication) ("A time period of four to seven years was not so remote as to erode the probative value of the extraneous offense evidence"); *Corley*, 987 S.W.2d at 617, 621 (holding extraneous crime thirteen years before trial was not too remote); *Keller v. State*, 818 S.W.2d 425, 429–30 (Tex. App.—Houston [1st Dist.] 1991, pet. ref'd) (concluding extraneous offense committed more than two years before charged offense was not too remote).

Moreover, we conclude the acts reflected by the texts and the acts the State alleged occurred on November 24, 2021 are substantially similar. The State argues that in January 2021, and in November 2021, Jasso entered Gonzalez's house without her consent and that both times, he was aggressive. In the January 2021 text exchange with Castillo, Jasso threatened both her and Gonzalez. And according to the State, he was aggressive in the November 2021 incident, first when he left the house, according to Gonzalez's testimony, and later when he returned, as evidenced by his yelling during the 9-1-1 call, pictures reflecting damage to the front door, and testimony he threw a water bottle at Gonzalez and kicked her dog. "Although the extraneous offense was not exactly the same as the offense charged, it need only be substantially similar to be admissible." *Corley*, 987 S.W.2d at 619 n.2; *Johnson v. State*, 932 S.W.2d 296, 302 (Tex. App.—Austin 1996, pet. ref'd) (same) (citing *Robinson v. State,* 701 S.W.2d 895, 898 (Tex. Crim. App. 1985); *Brown v. State*, No. 01-07-00607-CR, 2008 WL 1747876, at *6 (Tex. App.—Houston [1st Dist.] Apr. 17, 2008, pet. ref'd) (mem. op., not designated for publication) ("To show intent from extraneous offenses, the courts require only that the facts of the charged offense and the extraneous offense be substantially similar, not exact.").

Further, by telling the jury during opening statements that Jasso had not broken into the house, had entered the house only to retrieve his things, and had

24

spent the prior night, as well as other nights, at the house with Gonzalez's consent, defense counsel opened the door to testimony about the January 2021 texts, which manifest a clear lack of consent by Gonzalez for Jasso to be in her house and reflect Jasso's threats toward Gonzalez and her mother. *See Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008) (noting that defense opening statement opens door to admission of extraneous-offense evidence to rebut defensive theory raised in statement).

We hold the first factor weighs in favor of admission.

### 2.     Second Factor: The Potential to Impress the Jury

The second factor requires us to consider whether the extraneous offense evidence has the "potential to impress the jury in some irrational but indelible way," such as character conformity. *McGregor v. State*, 394 S.W.3d 90, 120 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (quoting *Blackwell v. State*, 193 S.W.3d 1, 15 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd)). Jasso argues "[t]he text messages are horrible. And the State knew that," beginning its closing argument by discussing the text messages and returning to the subject of the text messages later in its closing argument. He argues the closing argument "appeal[ed] to the jury's emotional side and encourage[d] the jury to make a decision on an emotional basis."

The State argues the January 2021 burglary and the November burglary "were the same overall offense," the limiting instruction given in the jury charge mitigated any improper influence on the jury, and Jasso's contention that the State repeatedly referred to the texts in its closing "is inapt."

With respect to the State's closing argument, approximately one-fifth of the State's rebuttal argument was devoted to the text messages. In its closing the State argued:

> Now, the law says that you can use surrounding circumstances to show that the defendant intended to commit assault when he walked through that door. And how did I show that to you? One was the defendant's own words: "I'm here at her house." That's what the defendant told Liza's mom back on January 24th of 2021. You have the text messages. You can look through them when you get back there. I will cause her hell until dead; I don't give a fuck; tell them I'm armed and dangerous: These are the defendant's own words.

Later in its argument, the State argued:

> So going back to January 24, 2021, exactly ten months before the case we're here on today, Victor knew Liza wasn't home. You heard Liza testify. She was on vacation in Mexico. Defendant called her and let her know he hadn't seen her for three days, he was gonna come take his stuff. Those text messages that you get to go back and look at are from January 24th between the defendant and Liza's mother, Lisa. The defendant says that I'm going into her home. He knew Liza wasn't there and when Judge was explaining in the jury instruction about using extraneous offenses to show motive, intent, opportunity, this is exactly what Victor was doing that day in January, using the opportunity that Liza wasn't there.

The text messages could have been intended to appeal to the jury's emotions and to prove character conformity. However, an impermissible inference of

26

character conformity "can be minimized by the use of a limiting instruction." *McGregor*, 394 S.W.3d at 120–21; *see also Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996) ("[T]he impermissible inference of character conformity can be minimized through a limiting instruction."). The jury charge included the following limiting instruction:

> You are further instructed that if there is any evidence before you in this case regarding the defendant's committing an alleged offense or offenses other than the offense alleged against him in the indictment in this case, you cannot consider such evidence for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offense or offenses, if any, and even then you may only consider the same in determining the motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident of the defendant, if any, in connection with the offense, if any, alleged against him in the indictment and for no other purpose.

We presume the jury "understood and followed the court's charge, absent evidence to the contrary." *Crenshaw v. State*, 378 S.W.3d 460, 467 (Tex. Crim. App. 2012); *see also Jenkins v. State*, 493 S.W.3d 583, 616 (Tex. Crim. App. 2016) (same).

Given the amount of time in the State's rebuttal argument dedicated to evidence other than the text messages and the court's limiting instruction, we do not conclude the jury was indelibly impressed by the texts. We hold this factor weighs in favor of admission.

### 3. Third Factor: The Time Needed

The third factor contemplates "the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the

indicted offense." *State v. Mechler*, 153 S.W.3d 435, 441 (Tex. Crim. App. 2005).

Castillo's testimony comprises approximately eight pages of the 162–page reporter's record of the trial and Gonzalez's testimony regarding the text messages spanned less than six full pages. This small portion of the trial devoted to the text messages weighs in favor of admission. *See Gaytan v. State*, 331 S.W.3d 218, 228 (Tex. App.—Austin 2011, pet. ref'd) (holding testimony that occupied thirteen pages of 200-plus-page trial transcript weighed in favor of admission under Rule 403); *Lane*, 933 S.W.2d at 520 (holding in Rule 403 analysis that extraneous-offense testimony that amounted to "less than one-fifth" of trial testimony was not excessive and weighed in favor of admission).

### 4. Fourth Factor: The State's Need for the Evidence

The Court of Criminal Appeals considers three factors to determine the State's need for the evidence: (1) does the proponent have other available evidence to establish the fact of consequence that the extraneous misconduct is relevant to show? (2) if so, how strong is that other evidence? and (3) is the fact of consequence related to an issue that is in dispute? *Montgomery*, 810 S.W.2d at 390; *see also Erazo v. State*, 144 S.W.3d 487, 495 (Tex. Crim. App. 2004) (identifying same subfactors). "When the proponent has other compelling or undisputed evidence to establish the proposition or fact that the extraneous misconduct goes to prove, the misconduct evidence will weigh far less than it

28

otherwise might in the probative-versus-prejudicial balance." *Montgomery*, 810 S.W.2d at 390.

Jasso argues only with respect to this factor that Gonzalez "was able to fully testify and explain what happened" and that the text messages were not needed "for any relevant purpose." He thus asserts the State did not establish a need for the text messages.

The State responds that during trial, defense counsel disputed that Jasso had "specific intent to commit assault" when he entered Gonzalez's house and he also argued that Jasso had effective consent to be in the house. In addition, defense counsel "sought to elicit testimony demonstrating a good relationship [between Jasso and Gonzalez], reconciliation, and other non-assault intents." Thus, the State argues, its need for the text messages was "substantial" and without the texts, the State only had circumstantial evidence to rebut Jasso's defensive theories and to prove effective consent and intent to commit assault.

The State concedes there was "some other available evidence" of the facts of consequence for which the text messages were admitted. And it also acknowledges that an owner's "lack of effective consent to an entry" in a burglary offense may be proved circumstantially. *See Fugate v. State*, 709 S.W.2d 29, 30 (Tex. App.—Corpus Christi-Edinburg 1986, no pet.); *cf. Lee v. State*, 962 S.W.2d 171, 174 (Tex. App.—Houston [1st Dist.] 1998, pet. ref'd) (noting that lack of

29

effective consent "may be proven solely by circumstantial evidence" in criminal offenses). The same is true with intent to commit assault. "Juries may infer intent [to commit assault] from a defendant's conduct and the surrounding facts and circumstances." *McIntosh v. State*, 297 S.W.3d 536, 541 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd).

We thus hold this factor weighs against admission.

In summary, because three factors weigh in favor of admission and one against, we hold the trial court did not abuse its discretion in admitting the text messages. "In close cases, courts should favor the admission of relevant evidence." *Salazar v. State*, 90 S.W.3d 330, 338 (Tex. Crim. App. 2002) (citing *Montgomery*, 810 S.W.2d at 389). Only in "rare cases" may we reverse a trial court's determination under Rule 403. *Caldwell v. State*, No. 02-23-00071-CR, 2023 WL 8467375, at *8 (Tex. App.—Fort Worth Dec. 7, 2023, no pet. h.) (mem. op., not designated for publication) (citing *Martinez v. State*, 468 S.W.3d 711, 718 (Tex. App.—Houston [14th Dist.] 2015, no pet.)); *see also State v. Villegas*, 506 S.W.3d 717, 767 (Tex. App.—El Paso 2016, pet. dism'd) ("The trial court's balancing of Rule 403 factors is entitled to our deference.").

## C.    Harm

Even if the admission of the text messages were an abuse of discretion, Jasso still would not prevail because he was not harmed by admission of the text

messages. As with other alleged evidentiary errors, we cannot reverse a trial court's ruling under Rule 403 unless the appellant establishes the trial court's error resulted in harm. *See* TEX. R. APP. P. 44.2 (setting forth standards for constitutional and non-constitutional harm); *see also Prible v. State*, 175 S.W.3d 724, 737 (Tex. Crim. App. 2005) (holding even though trial court abused its discretion by admitting autopsy photos over defendant's Rule 403 objection, any error was harmless); *Arevalo v. State*, 675 S.W.3d 833, 850 (Tex. App.—Eastland 2023, no pet.) (holding any error in admission of testimony about text messages was harmless).

Jasso argues he was harmed by the admission of the text messages because "[w]ithout the introduction of the text messages, the State's case turned entirely upon the testimony of the complainant." He states the text messages "formed the main part of the prosecutor's closing argument." He notes the jury requested to see all admitted evidence during deliberation. Jasso states the jury "rejected substantial portions of the complainant's testimony and ultimately went with a lesser-included offense. If those text messages had not been admitted, Mr. Jasso could well have been acquitted."

The State argues that any error in admitting the text messages was harmless because (1) other more prejudicial extraneous or character evidence was admitted without objection; (2) the State "gave relatively little emphasis to the texts in

31

closing;" (3) the jury's notes to the judge show it "focused last on non-extraneous materials before arriving at its verdict;" and (4) Jasso was convicted of a lesser-included offense.

First, the State notes that evidence was elicited from Gonzalez that Jasso previously had held a gun to her head, that Jasso is "malicious" and "evil," that Jasso kicked her dog on the night in question, and her door had only one working lock that night "because of another time where [Jasso] tried to come into [her] home without permission."

Second, the State disputes Jasso's contention that its closing argument focused on the text messages. As set forth above, the State twice referred in its closing to the text messages, taking up about one-fifth of its closing argument. The State also commented on other evidence in its closing. "The most important evidence of the intent to commit assault was what [Gonzalez] said right up there on that stand. . . . She told us that [Jasso] threatened her on November 24, 2021." The State discussed the door frame that Jasso allegedly broke while kicking down the door on November 24, 2021, the fact that Jasso carried a gun, and that he had put a gun to her head before. The State replayed the 9-1-1 call and said Gonzalez is "lucky . . . to be alive[.]" The State argued that Gonzalez "used her weapon and told [Jasso] to leave. Without [Gonzalez] pointing that gun at [Jasso], we may be here on a lot more serious charges instead of just burglary of habitation."

Third, the State argues the jury's notes to the trial court during deliberations "support harmlessness." In its final question, the jury asked to review (1) Officer Paz's testimony "regarding the condition of the door and door frame and his testimony regarding his interview with the son,"[17] (2) Officer Paz's "description of his first interaction" with Gonzalez, (3) Gonzalez's testimony regarding "what happened when the party arrived at the residence after eating" dinner, and (4) Gonzalez's response to questioning regarding Jasso's entering the residence. The jury did not ask to review testimony specifically about the text messages.[18]

We are most persuaded by the State's final argument. The State asserts a finding of harmlessness is supported by the jury's conviction of Jasso of the lesser-included offense of criminal trespass of a habitation, which does not include an element of intent to commit an offense.[19] To the extent the text messages were offered to prove the intent element of burglary of a habitation, we agree. "Logic dictates that when the complained[-]of evidence is offered to establish proof of the

---

[17] Gonzalez's son did not testify during the trial. Officer Paz interviewed the son, who said he and his sister lived in the home with their mother, Gonzalez, and that his father had slept at the house the night before.

[18] However, the jury did ask for all evidence that was admitted, so they had the text messages with them during their deliberations.

[19] One commits criminal trespass if he "enters or remains on or in property of another, including residential land . . . without effective consent and the person (1) had notice that the entry was forbidden; or (2) received notice to depart but failed to do so." TEX. PENAL CODE § 30.05(a). "Criminal trespass can be a lesser-included offense of burglary of a habitation." *Goad v. State*, 354 S.W.3d 443, 446 (Tex. Crim. App. 2011).

33

greater offense, but the jury acquits the defendant of that offense and convicts of the lesser offense, the complained[-]of evidence did not have a substantial and injurious effect or influence on the jury's verdict." *Bean v. State*, No. 13-01-030-CR, 2001 WL 34394342, at \*2 (Tex. App.—Corpus Christi–Edinburg Oct. 4, 2001, no pet.) (not designated for publication) (holding no harm resulted from admission of extraneous offense evidence offered to prove defendant's specific intent to kill when defendant was acquitted of murder and convicted of lesser offense of manslaughter); *see also Casey v. State*, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007) (holding appellant was not harmed by admission of prejudicial evidence because, among other things, jury convicted appellant of lesser-included offense); *Collins v. State*, No. 02-22-00252-CR, 2023 WL 4501828, at \*4 (Tex. App.—Fort Worth July 13, 2023, pet. ref'd) (mem. op., not designated for publication) ("Any claim of harm concerning the admission of the Count One prior-conviction evidence is undermined by the fact that the jury did not convict Collins of the offense alleged in Count One but instead merely found him guilty of the lesser-included offense of assault by contact.").[20]

Indeed, the only "intent" relevant in a criminal trespass action is the intent of the actor to enter the property. "[T]he offenses of burglary of a habitation and

---

[20] "Count One" was "assault–family violence by impeding breath with a prior conviction." *Collins v. State*, No. 02-22-00252-CR, 2023 WL 4501828, at \*1 (Tex. App.—Fort Worth July 13, 2023, pet. ref'd) (mem. op., not designated for publication).

criminal trespass have the same elements except that the offense of burglary has the element of intent to commit a felony or theft, whereas the offense of criminal trespass has no such element[.]" *Moreno v. State*, 702 S.W.2d 636, 640 (Tex. Crim. App. 1986). As such, we conclude the text messages likely had no bearing on the jury's conviction for criminal trespass.

We thus hold that any error in admitting the text messages was harmless. We overrule Jasso's sole issue.

## Conclusion

We affirm the trial court's judgment.

Veronica Rivas-Molloy
Justice

Panel consists of Justices Kelly, Countiss, and Rivas-Molloy.

Do not publish. TEX. R. APP. P. 47.2(b).